# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RCS CREDITOR TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0178-SG |
| | ) | |
| | ) | |
| NICHOLAS S. SCHORSCH; EDWARD | ) | |
| M. WEIL, JR.; WILLIAM KAHANE; | ) | |
| PETER M. BUDKO; RCAP HOLDINGS | ) | |
| LLC; AR CAPITAL, LLC; AR | ) | |
| GLOBAL INVESTMENTS, LLC; | ) | |
| AMERICAN REALTY CAPITAL | ) | |
| RETAIL ADVISOR, LLC; AMERICAN | ) | |
| FINANCE ADVISORS, LLC; | ) | |
| AMERICAN REALTY CAPITAL | ) | |
| HEALTHCARE III ADVISORS, LLC; | ) | |
| AMERICAN REALTY CAPITAL | ) | |
| HOSPITALITY ADVISORS, LLC; | ) | |
| NEW YORK CITY ADVISORS, LLC; | ) | |
| GLOBAL NET LEASE ADVISORS, | ) | |
| LLC; AMERICAN REALTY CAPITAL | ) | |
| HEALTHCARE II ADVISORS, LLC; | ) | |
| NEW YORK RECOVERY ADVISORS, | ) | |
| LLC; and BDCA ADVISER, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  February 8, 2021
Date Decided:  March 18, 2021

Philip Trainer, Jr. and Marie M. Degnan, of ASHBY & GEDDES, Wilmington, Delaware; OF COUNSEL:  John P. Coffey, Gregory A. Horowitz, Jeffrey S. Trachtman, and Leah S. Friedman, of KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York, *Attorneys for Plaintiff RCS Creditor Trust*.

Daniel A. Mason, of PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; OF COUNSEL:  Allan J. Arffa and Gregory F. Laufer of PAULL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York, *Attorneys for Defendants Nicholas S. Schorsch; Edward M. Weil, Jr.; William Kahane; Peter M. Budko; RCAP Holdings LLC; AR Capital, LLC; AR Global Investments, LLC; American Realty Capital Retail Advisor, LLC; American Finance Advisors, LLC; American Realty Capital Healthcare III Advisors, LLC; American Realty Capital Hospitality Advisors, LLC; New York City Advisors, LLC; Global Net Lease Advisors, LLC; American Realty Capital Healthcare II Advisors, LLC; New York Recovery Advisors, LLC; and BDCA Adviser, LLC.*

GLASSCOCK, Vice Chancellor

This matter involves breach of duty actions brought against a corporate controller and his affiliates, on behalf of the creditors of RCS Capital Corporation. That entity is bankrupt; the Plaintiff is a creditor trust. The Defendants have moved for summary judgment. A two-week trial looms in the immediate future. This brief and inelegant Memorandum Opinion grants the Defendants' Motion with respect to one of the three discrete claims brought by the trust—the others remain for trial. My reasoning is below.

## I. BACKGROUND[1]

The Plaintiff, RCS Creditor Trust, is a creditor trust that "has been assigned certain claims and causes of action" held by creditors of the now-bankrupt company, RCS Capital Corporation ("RCAP").[2] The Defendants are RCAP's former controller, Nicholas S. Schorsch ("Schorsch"), and his affiliates. Schorsch controlled RCAP through his ownership (through an entity called RCAP Holdings LLC ("Holdings")) of one share of Class B Common Stock, which held 50% plus one share of the voting interests in RCAP (the "Voting B Share").[3] A diagram of the relationships between the related parties and non-parties in this action is presented on the following page as Figure I.

---

[1] I base the facts for this summary judgment ruling on the evidence submitted under affidavit with the parties' papers as well as the parties' pleadings where undisputed facts are involved.
[2] Compl. ¶ 14; Answer ¶ 14.
[3] The ARC Parties' Opening Br. in Supp. of Their Mot. for Summ. J. 23, Dkt. No. 431 [hereinafter "MSJ OB"]; Pl.'s Answering Br. in Opp'n To The ARC Parties['] Mot. for Summ. J. 23, Dkt. No. 454 [hereinafter "MSJ AB"].

The Plaintiff alleges that the Defendants either breached their fiduciary duties or aided and abetted such a breach in connection with three sets of factual allegations: the so-called "core claim," the "Cole claim," and the "Apollo claim."[4] The Defendants have moved for summary judgment on all three of these claims. In this Memorandum Opinion, I deny the Motion for Summary Judgment (the "Motion") as to the Cole claim, grant the Motion as to the Apollo claim, and reserve judgment on the core claim.

---

[4] MSJ OB 3, 7; MSJ AB 42, 67, 69.

# Figure I



## II. THE COLE CLAIM

The Cole claim arises out of a failed deal between RCAP with American Realty Capital Properties, Inc. (the "Cole Parent"). The Cole Parent owned Cole Capital ("Cole"), a prominent distributor of real-estate investment trusts ("REITs"). In 2014, RCAP, which was in the business of providing services to REITs, including distribution services, sought to acquire Cole.[5] Schorsch sat on both the RCAP board of directors (the "Board") and on the Cole Parent board of directors.[6] The parties agree that Schorsch recused himself from Board votes relating to a transaction with Cole.[7]

During RCAP's negotiations with the Cole Parent, the Cole Parent's Audit Committee learned of potential misconduct regarding its—not Cole's—accounting and initiated an investigation.[8] The parties dispute what information Schorsch knew at the time regarding the investigation.[9] However, the parties agree that the Cole Parent did not disclose any information regarding the investigation to RCAP.[10] RCAP's board voted in favor of the Cole transaction on September 30, 2014.[11]

---

[5] MSJ OB 27; MSJ AB 32.
[6] MSJ OB 27; MSJ AB 32.
[7] MSJ OB 27–28; MSJ AB 32–33; Pre-Trial Stipulation ¶ 71, Dkt. No. 522.
[8] MSJ OB 28; MSJ AB 33.
[9] *Compare* MSJ OB 63, *with* MSJ AB 33.
[10] *See* MSJ OB 28; MSJ AB 33.
[11] MSJ OB 28; MSJ AB 33.

On October 29, 2014, the Cole Parent publicly disclosed the results of its internal investigation and committed to restating its financial statements.[12] The Defendants note, and the Plaintiff did not dispute in either its briefing or at oral argument,[13] that the misstatements that necessitated the restatements "did not relate in any way to the Cole Capital businesses that RCAP had contracted to purchase."[14] Regardless, RCAP's board decided that it no longer wished to consummate the Cole Transaction and terminated the deal.[15] In response, the Cole Parent sued RCAP and RCAP settled that litigation for $60 million.[16]

The Plaintiff argues that Schorsch knew of the investigation prior to RCAP's signing of the Cole transaction, owed RCAP a fiduciary duty to disclose the existence of the investigation, and that he failed to do so, thus breaching his fiduciary duties to RCAP and causing it to incur a $60 million loss.[17] The Defendants argue that Schorsch did not know enough about the substance of the investigation or about the Cole Parent's accounting issues to disclose it to RCAP.[18] Relevant to the determination of the Cole claim are, among other things: what Schorsch knew; when he knew the information that he did know; what he did or did not do regarding what

---

[12] MSJ OB 29; MSJ AB 33.

[13] *See* MSJ AB 33–35; 2-8-21 Tr. of Oral Arg. on the ARC Parties' Mot. for Summ. J. 78–81, Dkt. No. 510.

[14] MSJ OB 29.

[15] MSJ OB 29; MSJ AB 35.

[16] MSJ OB 29; MSJ AB 35.

[17] *See* MSJ AB 67.

[18] MSJ OB 63.

7

he knew; and what involvement he had at RCAP after he knew material information, if he did know it.[19] Those are all factual determinations that are better addressed with the benefit of trial.[20] Accordingly, the Defendants' Motion for Summary Judgment on the Cole claim is denied.

### III. THE APOLLO CLAIM

The Apollo claim arises out of RCAP's 2015 negotiation of a deal with Apollo Global Management, LLC ("Apollo") to the exclusion of a deal with Centerbridge Capital Partners III, L.P. ("Centerbridge"), allegedly at Schorsch's bidding. Neither deal, I note, was consummated.[21]

*A. Background*

In January 2015, after the failure of the aforementioned Cole transaction, the Board believed that RCAP needed financing. To that end, it decided to "evaluate alternatives and potentially take action with respect to the Company's wholesale business."[22] On January 23, 2015, the Chairman of the Board, Mark Auerbach ("Auerbach"), informed the Board that "he believed that it was possible that Apollo

---

[19] This is not meant to be an exhaustive, and should not be read as a preclusive, list of factual issues regarding this cause of action.

[20] Indeed, the Defendants offer Schorsch's deposition testimony in support of their position that he "did not learn about" the Cole Parent's "accounting issues or the substance of [its] internal investigation before . . . October 1, 2014." MSJ OB 63. Whether such testimony is credible is best determined at trial.

[21] Transmittal Decl. Pursuant to 10 *Del. C.* § 3927 of Daniel A. Mason in Supp. of the ARC Parties' Opening Br. in Supp. of Their Mot. for Summ. J. [hereinafter "MSJ OB Exs."], Ex. 78, at -87507, Dkt. No. 432; Pre-Trial Stipulation ¶ 87, Dkt. No. 522.

[22] MSJ OB Exs., Ex. 77, at -78768.

8

Global Management might make a proposal to acquire [RCAP's wholesale distribution] business and that it was possible that Nicholas Schorsch or an affiliate of his may be a participant in a proposed transaction or related transaction."[23] Given Schorsch's control over RCAP, the Board voted to establish a special committee of independent directors (the "Special Committee") to consider the potential Apollo transaction and "any alternatives available to the Company other than the Proposed [Apollo] Transaction."[24] Auerbach was designated the Chairman of the Special Committee.[25]

Initially, the terms of the proposed Apollo transaction were that Apollo would transact with both RCAP and another Schorsch-affiliated entity, AR Capital, LLC ("AR Capital").[26] Apollo would separately purchase both RCAP's wholesale distribution business, which provided distribution services for REITs, and a majority stake in AR Capital, with the latter contingent on the former.[27] As the Apollo transaction was being negotiated, however, RCAP received other overtures, including, on June 18, 2015, one from Ladenburg Thalmann ("Ladenburg") and one from Centerbridge.[28] The Special Committee considered whether to engage with Ladenburg, but had concerns due to the lack of a written proposal, Ladenburg's

---

[23] *Id.* Schorsch did not attend this Board meeting.
[24] *Id.* at -78769.
[25] *Id.*
[26] MSJ OB 30; MSJ AB 38.
[27] MSJ OB 30; MSJ AB 38; MSJ OB Exs., Ex. 92, at § 5.2(k).
[28] MSJ OB Exs., Ex. 78, at -87482.

9

status as a major client, and "the nature of the previous discussions being with respect to a stock-for-stock merger, which would not address the Company's short-term needs."[29] Despite these concerns, the Special Committee still authorized its financial advisor to engage with Ladenburg to see whether it could address RCAP's short-term financial needs.[30]

The proposed Centerbridge deal involved, among other things: (1) a potential $300-350 million investment in "convertible preferred stock"; (2) a rework of RCAP's management arrangement (the "Services Agreement")—because, in addition to being controlled by Schorsch, RCAP was also managed by a Schorsch-affiliated entity called RCS Capital Management, LLC (the "Manager"); and (3) a surrender of Schorsch's Voting B Share—i.e., his controlling stake.[31] The last two proposals, of course, would require Schorsch's consent because they implicated rights held by entities he controlled. The proposed Centerbridge deal also contemplated that debt financing related to the deal, as well as "a portion of the funds from the Potential [Centerbridge] Transaction, would be used to repay the Company's current secured credit facilities, including . . . the Series B preferred stock held by Luxor [Capital Group, LP]"[32] ("Luxor"), RCAP's second largest

---

[29] *Id.*
[30] *Id.* at -87482, -87483.
[31] MSJ OB Exs., Ex. 80; *see* MSJ OB 31.
[32] MSJ OB Exs., Ex. 80.

10

stockholder after its controller. Centerbridge also noted that it saw value in converting "the Series C convertible preferred stock held by Luxor into common stock."[33]

On June 27, 2015, "[t]he Special Committee unanimously agreed . . . to terminate further negotiations with Apollo and to refer Apollo to the Special Committee's counterproposal, which was distributed to them on June 18, 2015, should Apollo desire to reengage the Company in further discussions regarding a potential transaction."[34] Talks, however, did not actually end; on July 1, 2015, the Special Committee again discussed Apollo's proposed terms.[35] And Auerbach, who was also the Special Committee Chairman, informed the Special Committee of discussions he had had with Apollo on June 30.[36] The Special Committee also unanimously authorized Auerbach to continue engaging with both Apollo and Centerbridge, and to discuss the two proposals with Schorsch.[37]

By July 14, 2015, the Special Committee was considering three potential transactions: the Apollo deal, the Centerbridge deal, and a Ladenburg deal.[38] The Special Committee came to

---

[33] *Id.*
[34] MSJ OB Exs., Ex. 78, at -87489.
[35] *Id.* at -87490.
[36] *Id.*
[37] *Id.* at -87491.
[38] *Id.* at -87496. Although the potential for a Ladenburg deal was discussed, as well as some key terms that might go into such a deal, any Ladenburg deal does not appear to have progressed nearly as far as either the Centerbridge or Apollo potential transactions.

11

a general consensus as to the superiority of the Centerbridge transaction if it were doable given its requirement that the Company's controlling shareholder surrender the control created by the [Voting B Share] and otherwise support the transaction. One director suggested that the Special Committee should pursue the proposed transaction with Centerbridge and potentially consider a subsequent strategic partnership with Apollo.[39]

The Special Committee continued to discuss, in particular, the potential Centerbridge and Apollo transactions throughout July, including "the Centerbridge proposal's requirement that the Company redeem [the Voting B Share] and terminate the Services Agreement [with the Manager], both of which would require the approval of Mr. Schorsch."[40] The Special Committee also discussed, only a week later,

issues related to the ability of the Company to redeem the [Voting B Share], and whether Mr. Schorsch would be willing to clarify and explicitly agree as to the Company having such a redemption right and to agree to limit his ability to vote the [Voting B Share] in the interim, as required by the Centerbridge proposal. They also discussed Apollo's proposed treatment of the [Voting B Share].[41]

On July 23, 2015, Auerbach informed the other Special Committee members that Apollo's most recent term sheet was their final offer, which prompted discussion comparing the potential Centerbridge and Apollo transactions.[42] The Special Committee then "discussed the key objectives any transaction should seek to

---

[39] *Id.* at -87497.
[40] *Id.* at -87499.
[41] *Id.* at -87501.
[42] *Id.* at -87502.

12

accomplish, including the desirability for a prompt infusion of capital and a plan to address concerns regarding management, and the reasons why it would be beneficial to be in a position to announce a transaction by August 6, 2015."[43] When discussing "the ability to enter into a transaction with either Centerbridge or Apollo by August 6, 2015," however,

> Mr. Auerbach informed the Special Committee that Mr. Schorsch would not agree to any transaction with Centerbridge, given the extent of the dilution to existing shareholders that would result and his unwillingness to agree to give up the [Voting B Share] or its rights or to terminate the Company's Services Agreement with [the Manager] (and certain other parties) in connection with the Centerbridge proposal.[44]

The Special Committee "then discussed the uncertainties surrounding the Company's existing contractual rights related to the ability in the future to redeem the [Voting B Share], as well as how [it] would be dealt with under the terms of each of the Apollo and Centerbridge proposals." The Special Committee concluded this meeting by "unanimously determin[ing] to send the Apollo and Centerbridge term sheets to the other members of the Board for their review and comment."[45]

Three days later, on July 26, Auerbach informed the Special Committee that (a) Apollo had requested an exclusivity agreement and (b) Centerbridge was asking for $2 million for expense reimbursement and $4 million for a break-up fee, absent

---

[43] *Id.* at -87503.
[44] *Id.*
[45] *Id.*

which terms Centerbridge would cease diligence.[46]  While the Special Committee discussed whether to agree to Centerbridge's demands, Auerbach  noted that Schorsch "had reiterated his prior statements that he would not agree to a deal with Centerbridge, who had insisted on certain actions by Mr. Schorsch . . . be taken as part of any transaction, thus giving Mr. Schorsch the ability to block any such transaction."[47]  After more discussion of both the Apollo and Centerbridge transactions, however, the Special Committee unanimously rejected both an exclusivity agreement with Apollo and the requests by Centerbridge for further expense reimbursement and a break-up fee arrangement—the latter, because of "Schorsch's intention not to agree to a transaction with Centerbridge (which required his agreement to limit the use of the [Voting B Share] and to terminate the Services Agreement [with the Manager]."[48]

On August 3, Auerbach informed the Special Committee that "a series of negotiations . . . had taken place earlier in the day between himself, on behalf of the Special Committee, Luxor, Apollo, Centerbridge[,] and Nicholas Schorsch."[49] However, "Schorsch and Centerbridge could not reach an agreement with respect to

---

[46] *Id.* at -87505.
[47] *Id.*
[48] *Id.* at -87506.
[49] *Id.* at -87507.

the treatment of the [Voting B Share] and that, as a result, Centerbridge would not be participating in an investment in the Company."[50]

On August 5, two days after Centerbridge withdrew and one day before the Special Committee's self-imposed goal of announcing a transaction by August 6 expired, RCAP's CFO "advised the Special Committee that, absent a prompt infusion of capital, the Company might soon be unable to continue to meet its obligations."[51] After being advised by its financial advisor and its legal counsel, the Special Committee then unanimously approved a recommendation that RCAP enter into the proposed transaction with Apollo.[52] The terms of that transaction, which no longer included Apollo purchasing an interest in AR Capital, would include (a) the termination of the Services Agreement with the Manager, in exchange for a release of all claims against the Manager and affiliated entities (the "Release Agreement"), (b) a sale of preferred stock to Apollo, and (c) a sale of more preferred stock to Luxor.[53] While the Release Agreement was executed, the balance of the deal was never consummated.[54]

The Release Agreement, which binds AR Capital, Schorsch, other members of the Board (who, together with Schorsch, are defined as the "ARC Principals"),

---

[50] *Id.*
[51] *Id.* at -87508.
[52] *Id.* at -87511.
[53] *Id.* at -87512, -87513, -787515.
[54] Pre-Trial Stipulation ¶ 87, Dkt. No. 522.

RCAP, Holdings, and Luxor, was executed on November 8, 2015.[55] It provides that

RCAP

> does hereby unequivocally release and discharge AR Capital, and the ARC Principals and any of their former and current subsidiaries, equity holders, controlling persons, directors, officers, employees, agents, [and] affiliates . . . from any and all past, present, or future liabilities, actions, claims or damages of any kind or nature . . . apparent or not apparent, foreseen or unforeseen, matured or not matured . . . from the beginning of time until the date of execution of this Agreement, that in any way . . . arises from or out of, are based upon, or are in connection with or relate in any way to or involve, directly or indirectly, any of the actions, transactions, occurrences, statements, representations, misrepresentations, omissions, allegations, facts . . . or any other matters . . . based on . . . the Transaction Documents and the transactions contemplated by the Transaction Documents . . . .[56]

The "Transaction Documents" are defined to include an agreement between Apollo and AR Capital, an agreement between Apollo and the ARC Principals, and the agreement between Apollo and RCAP that was approved by the Board on August 6, 2015.[57]

*B. Analysis*

The Plaintiff summarizes the Apollo claim with the allegation that the Defendants "[r]efuse[d] [t]o [a]llow RCAP [t]o [p]ursue [a]ny [d]eal [b]esides the Apollo Transaction" and threatened the Special Committee into rejecting the

---

[55] MSJ OB Exs., Ex. 96.
[56] *Id.* at -652738.
[57] *Id.* at -652737, -652738.

16

Centerbridge transaction.[58]  In other words, the Defendants caused RCAP to lose the potential Centerbridge deal, theoretically damaging RCAP.  It is important to note that this claim does not address the unconsummated Apollo deal itself, where Schorsch conceivably would have stood on both sides.  Instead, the claim is that Schorsch acted to quash the *Centerbridge* deal.  In their Motion for Summary Judgment, the Defendants argue that the Apollo claim has been released by the Release Agreement, and, further, that the Defendants did not refuse to allow RCAP to pursue other deals.[59]

To be entitled to summary judgment, the Defendants must first "establish that no material question of fact exists and they are entitled to relief as a matter of law."[60] Once they have made "a *prima facie* showing, with reasonable certitude" that no material question of fact exists, the burden shifts to the non-moving party, the Plaintiff, "to come forward with further evidence to demonstrate that there is a genuine issue of fact on the question."[61]   If the Plaintiff discharges this burden, the Defendants "must then demonstrate that the [Plaintiff's] evidence is legally

---

[58] MSJ AB 38.  The Complaint's breach of fiduciary duty count against the Defendants with regards to the Apollo transaction are that the Defendants "us[ed] their control to prohibit the Special Committee of independent directors from pursuing a potential restructuring transaction with a counterparty other than Apollo."  Pl.'s Verified Compl. For Breach of Fiduciary Duties ¶ 129, Dkt. No. 1.

[59] MSJ OB 66–68.

[60] *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 119 (Del. Ch. 1986).

[61] *Alcott v. Hyman*, 208 A.2d 501, 506–507 (Del. 1965).

insufficient to establish their claim."[62] Further, because this is the Defendants' motion, I "must view the evidence in the light most favorable to the" Plaintiff.[63]

The Defendants point to record evidence that they did not exert control over the Special Committee or independent directors in order to prevent them from exercising their business judgement on behalf of RCAP with regard to the Centerbridge or Apollo transactions. The Defendants, in their Opening Brief, note that the Board created a special committee of independent directors in light of Schorsch's controller status, which committee was charged with analyzing the Apollo deal and soliciting alternatives.[64] After Auerbach reported to the Special Committee that Schorsch would not consent to Centerbridge's terms, the Special Committee nonetheless "unanimously agreed not to authorize execution of an exclusivity agreement with Apollo."[65] In further support of the committee's independence, the Defendants cite[66] to Special Committee minutes that show the Special Committee being informed of Schorsch's position and, at the conclusion of that same meeting, "unanimously determin[ing] to send the Apollo *and the Centerbridge* term sheets to the other members of the Board for their review and

---

[62] *Mehan v. Travelers Ins. Co.*, 1988 WL 62793, at *1 (Del. Ch. June 16, 1988).

[63] *In re El Paso Pipeline Partners, L.P. Deriv. Litig.*, 2014 WL 2641304, at *1 (Del. Ch. June 12, 2014).

[64] MSJ OB 30; MSJ OB Exs., Ex. 77.

[65] MSJ OB 31 (quoting MSJ OB Exs., Ex. 78, at -87506).

[66] *See* MSJ OB 31.

comment."[67]  The Defendants also note that the Special Committee engaged with "various potential investment sources, including Apollo and Centerbridge[,]"[68] and also cite to Special Committee minutes that show that the Special Committee also engaged with Ladenburg Thalmann.[69]  Given that (a) the Special Committee considered a potential transaction with Ladenburg as well as Centerbridge and Apollo and (b) the Special Committee continued to consider the Centerbridge deal— even refusing an exclusivity arrangement with Apollo—after Schorsch's stated opposition to the Centerbridge deal, the Plaintiff must come forward with some indicia the Defendants exerted control over the Special Committee with respect to its consideration of these transactions.[70]

The Plaintiff's Answering Brief presents only one factual allegation in rebuttal regarding the Defendants' actions:  that Schorsch allegedly "threatened" the Special Committee by telling Auerbach that he would not give up his Voting B Share or approve the termination of the Services Agreement in connection with the Centerbridge deal.[71]  Of course, if a controller uses her voting control to bully directors, she has thereby assumed fiduciary duties.  Such a threat robs the directors of the opportunity to put their business judgment on behalf of the entity over their

---

[67] MSJ OB Exs., Ex. 78, at -87503 (emphasis added).
[68] MSJ OB 68.
[69] *E.g.*, MSJ OB Exs., Ex. 78, at -87482.
[70] *See Alcott v. Hyman*, 208 A.2d 501, 507 (Del. 1965).
[71] *See* MSJ AB 40, 69.

own—now threatened—interests. Here, however, the Plaintiff points to no record evidence that supports the existence of such a threat. The "threat" alluded to here is simply a statement that Schorsch would vote his stock in his business interest, in not giving up his contractual rights and majority ownership in order to approve the Centerbridge deal. This is not a threat to the independence of the Special Committee; it is simply a business decision that Schorsch communicated to the committee. A stockholder does not forfeit the right to exercise contract rights or to vote her stock merely by being a controller.[72] There is no duty for a controller to sacrifice on behalf of the company.[73] Given that the evidence of record cited by the parties at this Summary Judgment phase shows that the Special Committee acted independently within its business judgment, and that Schorsch and the other Defendants did nothing but inform the committee that Schorsch would vote against what he perceived as a personally unfavorable deal, there simply are no factual questions for trial, and I conclude that the Defendants are entitled to summary judgment in their favor.

---

[72] *Ford v. VMware, Inc.*, 2017 WL 1684089, at *15 (Del. Ch. May 2, 2017) ("Delaware courts consistently have held that a controlling stockholder's fiduciary duty does not constrain its ability to vote its shares.").

[73] "Delaware law does not . . . impose on controlling stockholders a duty to engage in self-sacrifice for the benefit of minority shareholders. . . . As Chancellor Allen aptly wrote in *Thorpe v. CERBCO, Inc.*, '[c]ontrolling shareholders, while not allowed to use their control over corporate property or processes to exploit the minority, are not required to act altruistically towards them.'" *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1040–41 (Del. Ch. 2012) (citing *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *7 (Del. Ch. Oct. 29, 1993)).

Given this decision, I need not consider the applicability of the Release Agreement here.

## IV. THE CORE CLAIM

Upon reviewing the parties' briefing, I believe that the resolution of the core claim would benefit from the creation of a trial record.[74] Accordingly, I will consider the summary judgment briefing on the core claim as part of the pre-trial briefing.

## V. CONCLUSION

For the forgoing reasons, the Defendants' Motion for Summary Judgment is denied in part and granted in part. The parties should submit a form of order consistent with this Memorandum Opinion.

---

[74] "[T]he court may, in its discretion, deny summary judgment if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into and develop the facts more thoroughly at trial in order to clarify the law or its application." *In re Energy Transfer Equity L.P. Unitholder Litig.*, 2017 WL 782495, at *9 (Del. Ch. Feb. 28, 2017) (quoting *In re El Paso Pipeline Partners, L.P. Deriv. Litig.*, 2014 WL 2768782, at *9 (Del. Ch. June 12, 2014)).